Danforth, J.
 

 The points made by the appellant are that the court erred, first, in refusing to grant defendant’s motion for a nonsuit; second, in refusing to charge as requested by it, viz.: “That the fact that the gates were now down was not such an assurance of safety to the intestate as obviated the necessity of using his eyes and ears to ascertain whether a train or engine was approaching, and if, notwithstanding the condition of the gates, he might have seen or heard the engine if he had looked or listened, and as he did not the plaintiff cannot recover;'’ and, third, that the damages allowed by the jury were excessive and entitle it to a new trial.
 

 The last proposition requires no consideration, for the question was exclusively for the jury and the supreme court. The motion for a nonsuit was reserved until after the defendant put in evidence to meet the plaintiff’s case, and the special ground then urged was that it affirmatively appeared that the plaintiff’s intestate was guilty of contributory negligence. It appeared in evidence that Foster, on the 24th of May, 1884, was traveling southward with horse and covered buggy, at the rate of from four to five miles an hour, along ,a highway known as Walnut street in the village of Batavia. The street ran north and south, and in his way was ■crossed by defendant’s road of five tracks running east and west, at an angle with the street of forty-three degrees. He passed three of the tracks in safety, but while on, and in part over the next, was struck by defendant’s locomotive, which was running along that track westerly, very fast, or from twenty to twenty-five miles an hour, and without signal. He and his horse were at once killed, and the buggy broken in pieces. This is not] unusual narrative in collision cases, but the attending circumstances were somewhat exceptional. The engine was attached to no train or car. It was small in size, much smaller than the ordinary locomotive. It was neither designed nor used for passenger or
 
 *906
 
 freight' business. It was running on no schedule time. It was in charge of no' conductor. It carried one person, the superintendent of the division, and was subject wholly to his direction. It was manned by an engineer and fireman, but the construction of the engine was such that the cab occupied by the superintendent was over the boiler at the fore end of the engine, and the engineer and firemen were behind. Their view in front was thus wholly obstructed, except as the lines of vision, were outside of the cab; and down and along the track they could have a sight of nothing except as they leaned out and away from their place. In fact, as each testifies, neither the fireman nor engineer saw the man, horse or buggy, until the moment of the collision. The bell instead of being on top of the engine, was, as some testify, behind and below it, or as the engineer says, “ on the tail end of the engine, on the top of the tender.”
 

 It was of a tone different from that of ordinary locomotives, and the machine itself moved with little noise and with less than that of a train engine. It wxas used for the business of the occupant, either of observation or travel, and was so constructed as to facilitate either. As its 'use and construction differed from that of ordinary locomotives, so did its .management. Instead of obedience to the statute, which requires the bell or whistle to be rung or sounded at
 
 k
 
 given distance from the place where the railroad shall cross any travelled public road or street, and at intervals, until it shall have crossed that road or street, and so makes the presence of the crossing an imperative order to the managers' of the engine, it was made the duty of the engineer to' blow the whistle only when notified to-do so by his passenger, the superintendent, and in this instance such direction was given only when quite near the-crossing, and by the time the brakes were set and steam shut off, the engine was “upon” the intestate. The1, plaintiffs’ witnesses show that at the same moment the. bell was for the first time rung. One of them watching the locomotive 1
 
 ‘
 
 did not notice any bell ringing until whistle began to blow, about half way between the bridge and the crossing ; then the bell rang and whistle blew.”' This was a short distance from the point of danger. Concerning the bell, there was evidence from the engineer and fireman to the contrary, but none from the superintendent,: who was not called to testify. There was evidence enough to warrant the jury in finding that no signal of any kind was given. They would have been compelled to say that-the construction of the locomotive was such as to render-vigilance on the part of the employees almost, if not wholly useless ; that the position of the bell was less favorable to the distribution of sound than the place assigned to-it by statute, and that the engine itself gave little or no
 
 *907
 
 notice of its approach. The flagman also, who for twenty-five years had been stationed at the crossing, was absent. This was conceded. But besides these things, which are to he regarded as omissions or departures from the ordinary and, in some respects, required methods of the defendant’s business in giving audible or visible signals of approach, and indicating negligence on its part, there are affirmative acts,. not only compelling the same conclusion, but directly tending to influence the conduct of the wayfarer and, indeed, ■expressly designed to do so.
 

 The defendant “for the better protection of life,” and to promote the safer and better management of its road,” ■either of its own volition or under the command of law (Laws of 1884, chap. 439, § 3), had erected gates across Walnut street, on either side of its tracks, and had stationed a person there 6 ‘ to open or close such gates when an engine or train passed.” The duty of the company was imperative, and it is obvious that an open gate was a direct and ex plicit assurance to the traveler that neither train nor en • gine was rendering the way dangerous; that none was passing. A closed - gate was an obstruction preventing access to the road; an open gate was equaHy positive in the implication to be derived from it that the way was safe. Nothing less could be implied and no other conclusion ■could be drawn from that circumstance. The silence of the bell and whistle, was - an indication that no train or locomotive was within eighty rods of the crossing, the ■open gate an affirmative and explicit declaration and representation that neither train nor locomotive was approaching with intent to pass. The way then was open to the intestate, and as the highway was straight, that fact was apparent to him, not only when he reached the track, but for a long distance off. He had a right to rely to a certain extent upon that representation.
 
 Stapley
 
 v.
 
 Railway,
 
 1 Ex., L. R., 21;
 
 Glushing
 
 v.
 
 Sharp,
 
 96 N. Y., 676. It is -difficult therefore to see how his death can be attributed to any other cause than the negligent acts of the defendant. But if there is room for a different inference, there is not enough of it to make the question one of law. He could not rush heedlessly on to danger and throw the result upon the defendant, but the degree of care required of a traveler is increased or diminished by the greater or less probability suggested by the circumstances about him, that without it an injury will happen. When therefore he moves on upon the track under an assurance of safety from those owning it, and from their servants, whose especial duty it was to keep their attention fixed upon it, and who had within their power the means of avoiding the infliction of injury, and whose business it was to use them so as to prevent
 
 *908
 
 danger, it is for the jury to say whether the traveler exercised that ordinary care and prudence, which under the circumstances, it would be natural to expect. The cases above-referred to
 
 (Stapley
 
 v
 
 Railway, Glushing
 
 v.
 
 Sharp)
 
 if any are necessary in support of so plain a proposition, are sufficient for that purpose.
 

 But, notwithstanding the defendant by it's conduct assured the intestate that no engine or train was approaching, and so invited him to go over its tracks, it is contended by the defendant’s counsel that the intestate was yet' bound to keep a lookout against danger; that if he did so, he must have seen the engine in time to have avoided it, and that he either did not look, or did see the engine, and' therefore went on at his peril. The claim at the trial was that the plaintiffs’ negligence was affirmatively shown. There is no evidence that he did not both look and listen.' The question was left to the jury by a charge, to which no exception was taken, and we think the learned judge committed no error in submitting it. The evidence shows that-to a traveller coming from the north, the view of the railroad at the east was obstructed by apple and maple trees in full leaf, by buildings of various kinds, some belonging to the railroad company, while at the west, on track four, the track nearest the approaching traveller, not far from the crossing, a freight train stood, its engine taking water and discharging steam from the escape valves, and a stiff breeze blowing from the southwest, and so bringing the steam directly in the way. It was possible, notwithstanding, at certain points, to get a glimpse of the railroad at the east, and from lines and measurements exhibited by a surveyor and the observations of other persons, we are asked to say as matter of law that the intestate in not seeing the engine was guilty of negligence. The size of the engine, its construction permitting, if seen, the inference that it was' going away from the crossing, and not coming towards it; the presence of a train on the track nearest the traveller; the obstructions to the view, and, above all, the extended-arms of the gates and the way thus made open, are all to-be considered, and their consideration was for the jury. The conduct of the intestate might have been influenced by them, and to what extent, it was for the jury to determine.
 
 Kellogg
 
 v.
 
 N. Y. C. R. R.,
 
 79 N. Y., 72;
 
 Shaw
 
 v.
 
 Jewett,
 
 86 id., 616;
 
 Sherry
 
 v.
 
 R. R.,
 
 104 id., 652; 5 N. Y. State Rep., 574. We see no ground on which the court could say the intestate did not use reasonable care in approaching the crossing.
 

 The request to charge involves the assertion that the intestate neither looked nor listened, and so was erroneous. Whether he looked or listened was for the jury to deter
 
 *909
 
 mine
 
 (Smedis Case,
 
 88 N. Y., 13;
 
 Kellogg's Case, supra),
 
 and if they found he did not look or listen, to say whether had he done so, it would have been possible for him to have seen or heard the approaching engine in time to avoid it.
 
 Thompson v. Same Def't,
 
 110 N. Y., 636; 16 N. Y. State Rep., 869. If he looked and listened it was for the jury to say whether he saw the machine on the track, and if he did, whether by its position and appearance he was informed that it was an engine approaching the crossing, or whether, from the situation of the cab and the absence of signal, he might be led to believe it was going from, and not towards the crossing, and whether, adding to these circumstances the open gates, he might not reasonably believe and with ordinary prudence govern himself by that belief, that whichever way it was moving it was not intending to pass the highway. These circumstances were of the defendant’s creation. They indicate not only omissions of duty which when performed are designed to notify the traveler of his danger, as by signal, but affirmative acts assuring him that no danger exists, as in the going off! of the flagman and the raising of the gates. I do not think the court can say as matter of law that the statutes which require signals and precautions can be disregarded by the defendant, and it be allowed to claim that the traveler should not be influenced by these omissions. While the court could not as matter of law say that the plaintiff did not look, neither would that fact if found enable it to say as matter of law that negligence was established.
 
 Terry
 
 v.
 
 Jewett,
 
 78 N. Y., 338;
 
 Brassell
 
 v.
 
 N. Y. C. R. R.,
 
 84 id., 241.
 

 In the first case an intending passenger, and in the last a passenger leaving the cars were injured. It was held that each had a right to assume that the company would not expose him to unnecessary danger, and while he must himself exercise reasonable care, his watchfulness is naturally diminished by his reliance upon the discharge by the company of its duty to provide a safe passage to and from the trains. The duty there referred to was obedience to the common law obligation to conduct its business with reasonable care not to injure another.
 

 In the case before us we have superadded the provisions of positive law designed to regulate the conduct of corporations created by it. Effect must be given to these wise regulations concerning measures to be adopted by a railroad company for the safety of the traveller. He is not bound to wholly discredit the assurance of the servants of the company that the conditions which require those regulations to be observed, do not exist. In general it may be imprudent to enter upon a track while a locomotive is approaching.
 
 *910
 
 Whether it is so in a particular case must depend upon the circumstances under which the attempt to cross is made. And where, though in fact it may Toe hazardous, a traveller does so in consequence of the acts of the defendant, he can not be charged with negligence unless the risk or danger was apparent. In this case the engine, although in motion, made no signal that it was to pass the crossing, but a signal was given by its owner that it was not to pass. The track and the moving engine were signs of danger, but the engine, although moving, was not dangerous unless it passed the crossing; as to that he had assurance that it was not, from the silence of the bell and whistle, and the position and affirmative assurance fi;om the open gates. The effect of such assurances from employees, of the nonexistence of danger is exemplified, among many others, in the
 
 Filer Case
 
 (49 N. Y. 47); the
 
 Foy Case
 
 (18 C. B,, N. S .,225), where by direction of an employee, a passenger left a train while it was in motion; in
 
 McIntyre's Case
 
 (37 N. Y. 287), where under like circumstances a passenger went from one moving car to another; in the
 
 Glushing Case (supra),
 
 where the traveller went on the track through an open gate under circumstances which except for that, disposed negligence on his part. In all these cases it was regarded as an important element in the case that the defendant had involved the plaintiff in his attempt.
 

 The facts before us, therefore, fall short of requiring as the sole inference from them that a want of ordinary care on the part of the intestate, .contributed to the injury. Whether it did or not was a question depending upon all the circumstances of.the case
 
 (Johnson
 
 v.
 
 H. R. R. R. Co.,
 
 20 N. Y. 65). Negligence can not be presumed, and where )by the act of the defendant a person has reason to believe that he may cross the track in safety, his attempt to do so and his lack of that vigilence which under other circumstances might be required, cannot be .regarded as constituting negligence. He is still bound to exercise ordinary and reasonable care, but the measure of his duty varies with the peculiar circumstances of the case, and its fulfillment must be determined by the jury. This conclusion disposes of both questions raised by the appellant and requires an affirmance of the judgment from which it appeals.
 

 It should be affirmed, with costs.